**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| DAPHNE JONES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>GRACO CHILDREN'S PRODUCTS, INC. and NEWELL BRANDS DTC, INC.,<br><br>Defendants. | NO.<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Daphne Jones ("Plaintiff") on behalf of herself and all others similarly situated, by and through counsel, brings this action against Defendants Graco Children's Products, Inc. and Newell Brands DTC, Inc. ("Defendants"). The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to herself and her own actions and counsels' investigations, and upon information and belief as to all other matters, are as follows:

## NATURE OF THE CASE

1. This class action arises from Defendants' retention of windfall profits generated by unlawful tariffs imposed by the federal government under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq*.

2. Beginning in February 2025, the federal government imposed sweeping tariffs on imports from numerous countries under purported authority of the IEEPA. Those tariffs dramatically increased the cost of imported consumer goods sold in the United States.

3. Major U.S. importers—including Defendants—responded by increasing prices on consumer goods to offset the cost of these tariffs. As a result, American consumers paid higher retail prices for consumer goods reflecting the economic burden of those tariffs.

4. On February 20, 2026, the Supreme Court of the United States held that the IEEPA-based tariffs were unlawful. *Learning Resources, Inc. v. Trump*, 607 U.S. ___ (2026).

5. As a consequence of that decision, importers who paid those tariffs—including Defendants—became entitled to refunds of the duties they previously paid to U.S. Customs and Border Protection ("CBP").

6. The economic reality of the tariff regime, however, is that importers like Defendants did not ultimately bear all the costs of the tariffs. Instead, the importers passed the elevated costs on to consumers in the form of higher retail prices.

7. Defendants therefore collected the tariff costs from consumers through elevated pricing, while the federal government owes Defendants refunds of the same tariff payments.

8. Unless restrained by this Court, Defendants stand to recover the same tariff payments twice—once from consumers through higher prices and again from the federal government through tariff refunds, including interest paid by the government on those funds.

9. Defendants have made no legally binding commitment to return tariff-related overcharges to the consumers who actually paid them.

10. This lawsuit seeks to prevent that unjust result.

11. Plaintiff brings this action on behalf of millions of consumers who purchased goods from Defendants during the tariff period and who paid inflated prices reflecting Defendants' pass-through of unlawful tariffs.

12. Plaintiff seeks restitution of those tariff overcharges, together with appropriate declaratory, injunctive, and monetary relief.

## JURISDICTION AND VENUE

13. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because: (a) at least one member of the class, including Plaintiff, is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000,

exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

14. The Court has personal jurisdiction over Defendants because they are headquartered in this district, conduct significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants' principal place of business is located in this District in Atlanta, Georgia, and a substantial portion of the events and conduct giving rise to the claims occurred in this District.

## PARTIES

18. Plaintiff Daphne Jones is a resident and citizen of Kendallville, Indiana. During the Class Period[1], Plaintiff Jones purchased a Graco car seat that was imported from countries subject to the IEEPA tariffs. Plaintiff Jones paid retail prices for those goods that were increased by Defendants to account for the tariffs imposed on imported products. Plaintiff Jones would not have paid those higher

[1] The "Class Period" is the period during which Defendants assessed tariff related charges to consumers. The precise contours of the Class Period can only be determined through discovery. In no event shall the Class Period be less than the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

prices absent the unlawful tariffs and Defendants' pass-through of those tariffs to consumers.

19. Defendant Newell Brands DTC, Inc. is a Delaware corporation with its principal place of business at 6655 Peachtree Dunwoody Road, Atlanta, Georgia 30328. Graco Children's Products is a wholly-owned subsidiary of Defendant Newell Brands DTC, Inc.

20. Defendant Graco Children's Products, Inc. is a Delaware corporation with its principal place of business at 6655 Peachtree Dunwoody Road, Atlanta, Georgia 30328. Graco designs, manufactures, markets, sells, and distributes the children's products throughout the United States. A significant portion of the products Graco sells are imported goods subject to IEEPA tariffs imposed by the United States government.

## FACTUAL BACKGROUND

### A. Defendants' Business

21. Newell Brands Inc. is an American conglomerate of consumer and commercial products. Founded in 1903, Newell went public in 1972 on the NASDAQ.[2]

[2] Porter's Five Forces, *What is Brief History of Newell Brands Company?,* https://portersfiveforce.com/blogs/brief-history/newellbrands. (last accessed May 19, 2026)

22. Newell Brands is a $7.6 billion company generating roughly $900 million in annual EBITDA, with about 62% of sales in the U.S. and 38% international, operating across more than 10 countries.[3]

23. Newell Brands is a leading global consumer goods company with a strong portfolio of well-known brands, including Rubbermaid, Sharpie, Graco, Coleman, Rubbermaid Commercial Products, Yankee Candle, Paper Mate, FoodSaver, Dymo, EXPO, Elmer's, Oster, NUK, Spontex and Campingaz.[4]

24. Newell's baby portfolio includes Graco, Baby Jogger, and NUK, positioning the company as a leader in baby gear and care. Graco is one of Newell's most recognizable and strategically important brands, covering car seats, strollers, play yards, highchairs, and infant care products.[5]

25. Defendants manufacture most if not all products outside of the United States in places such as Asia, which is a major hub for the brand's manufacturing activities.

---

[3] Investing, *Newell Brands at 2025 dbAccess Conference: Strategic Turnaround Insights,* https://www.investing.com/news/transcripts/newell-brands-at-2025-dbaccess-conference-strategic-turnaround-insights-93CH-4079636. (last accessed May 19, 2026)

[4] Newell Brands Inc. 2025 Annual Report, https://www.sec.gov/Archives/edgar/data/814453/000119312526126333/d81575dars.pdf.

[5] Newell Brands, *Newell Brands' Baby Business Earns Industry Accolades in 2025,* https://www.newellbrands.com/our-stories/newell-brands-baby-business-earns-industry-accolades-in-2025. (last accessed May 19, 2026)

### B. The IEEPA Tariffs

26. Beginning in February 2025, President Trump invoked the IEEPA to impose tariffs on imports from numerous foreign countries pursuant to a series of executive orders declaring national emergencies related to trade and supply chain concerns.[6]

27. Those executive orders imposed sweeping tariffs on imports from key U.S. trading partners. The orders included duties of approximately 25 percent on many imports from Canada and Mexico and additional tariffs on imports from China that were layered on top of existing duties, resulting in substantially higher effective tariff rates on Chinese goods.[7]

28. The tariffs significantly increased the cost of imported consumer goods entering the United States, particularly for retailers and other businesses that rely heavily on international supply chains to source merchandise—like Defendants.[8]

---

[6] *See* Exec. Order No. 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025); Exec. Order No. 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025); Exec. Order No. 14195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025). (last accessed May 19, 2026)

[7] *See* Reuters, *Trump Orders Tariffs on Canada, Mexico and China*, Feb. 1, 2025.

[8] *See* Mary Amiti, Stephen J. Redding & David Weinstein, *The Impact of the 2018–2019 Tariffs on Prices and Welfare*, 135 J. Econ. Persp. 187 (2020) (last accessed May 19, 2026)

29. Under U.S. customs law, the importer of record is responsible for paying tariffs when goods enter the United States. Accordingly, importers of record—including major retailers such as Defendants—were required to pay the IEEPA tariffs to U.S. CBP upon entry of covered merchandise into the country.[9]

30. Numerous importers challenged the legality of the IEEPA tariffs in the United States Court of International Trade, arguing that the President lacked statutory authority under IEEPA to impose tariffs of that nature.[10]

31. On February 20, 2026, the Supreme Court of the United States held that the challenged tariff regime was unlawful and that IEEPA does not authorize the President to impose tariffs of the type challenged in that litigation and invalidated the tariff orders issued pursuant to that statute.[11]

32. The Supreme Court's decision effectively eliminated the legal basis for the IEEPA tariffs and created a pathway for importers that had paid those duties—including Defendants—to seek refunds of the tariffs previously collected by the federal government.

[9] *See* U.S. Customs & Border Prot., *Importing Into the United States: A Guide for Commercial Importers*. (last accessed May 19, 2026)

[10] *See* Reuters, *Businesses Sue Over Trump's Tariffs*, Apr. 2025. (last accessed May 19, 2026)

[11] *See Learning Res., Inc. v. Trump*, 607 U.S. ___ (2026)

### C. Tariffs Are Economically Borne by Consumers

33. Economists and government agencies widely recognize that tariffs are largely borne by domestic consumers rather than foreign exporters or the importing firms that formally remit the duties.

34. Economic studies examining recent U.S. tariff regimes consistently find that the cost of tariffs is passed through into higher prices paid by U.S. purchasers of imported goods.[12]

35. When tariffs increase the cost of imported goods, retailers and other downstream sellers typically raise prices to offset those additional costs. Surveys of U.S. businesses conducted by the Federal Reserve Bank of New York during the recent tariff period found that a large majority of companies facing tariff-related cost increases passed at least some portion of those costs through to their customers in the form of higher prices.[13] Companies consider tariffs to be costs that are to be incorporated into the pricing structure.

---

[12] *See* Julian Hinz et al., *America's Own Goal: Who Pays the Tariffs?*, Kiel Inst. for the World Econ. Policy Brief (Jan. 19, 2026); see also Mary Amiti, Stephen J. Redding & David Weinstein, *The Impact of the 2018–2019 Tariffs on Prices and Welfare*, 135 J. Econ. Persp. 187 (2020) (last accessed May 19, 2026)

[13] *See* Jaison R. Abel, Richard Deitz & Jason Bram, *Are Businesses Absorbing the Tariffs or Passing Them On to Their Customers?*, Fed. Rsrv. Bank of N.Y., Liberty Street Econ. (June 4, 2025), available at https://libertystreeteconomics.newyorkfed.org.) (last accessed May 19, 2026)

36. Similarly, the Federal Reserve Bank of Dallas recently confirmed that the 2025–2026 tariffs materially increased consumer prices and that "pass-through from the 2025 tariffs is effectively complete," meaning the costs of the tariffs were ultimately borne by purchasers through higher prices.[14]

37. The Dallas Federal Reserve further explained that tariff collections "boosted core goods PCE[15] inflation by approximately 2.2 percentage points" and increased overall core PCE inflation by approximately 0.8 percentage points, reflecting widespread downstream price increases imposed on consumers as businesses passed tariff costs through the supply chain.[16]

38. These findings confirm that tariffs imposed during the relevant period functioned as a direct economic burden on consumers because businesses responded to the tariffs by increasing prices charged to end purchasers rather than internally absorbing the additional costs.

---

[14] *See* Ron Mau & Tucker Smith, Effects of Realized Tariff Changes on PCE Prices Peaked in First Quarter 2026, Fed. Rsrv. Bank of Dall. (May 5, 2026), available at: https://www.dallasfed.org/research/economics/2026/0505-mau. (last accessed May 19, 2026).

[15] "PCE" refers to Personal Consumption Expenditures, an economic measure of how much consumers are spending on goods and services in the economy.

[16] *See* Ron Mau & Tucker Smith, Effects of Realized Tariff Changes on PCE Prices Peaked in First Quarter 2026, Fed. Rsrv. Bank of Dall. (May 5, 2026), available at: https://www.dallasfed.org/research/economics/2026/0505-mau. (last accessed May 19, 2026)

### D. Defendants' Statements on Tariff Related Price Increases and Refunds

39. Defendants publicly acknowledged, early in the tariff period, that tariffs would increase their costs and place upward pressure on consumer prices.

40. Defendants' executives said during an April 30, 2025 earnings call that the companies raised prices on its baby gear by about 20%, citing tariff pressures. They noted the company was equipped to handle the tariffs unless duties on imports from China were raised further, since the majority of baby gear sold in the U.S. is made in China.[17]

41. In its Q2 2025 earnings disclosure, Graco's CEO acknowledged that tariffs introduced during the quarter caused component costs to rise, and announced the company would implement a targeted price increase beginning in September 2025. The CEO characterized the price increase as a necessary response to the current trade environment, noting that while the timing departed from Graco's usual practice, it was required to offset tariff-driven cost increases affecting industrial manufacturers.[18]

---

[17] CNBC, *Here are the retailers raising prices as Trump tariffs take hold,* https://www.cnbc.com/2025/05/31/trump-tariffs-here-are-the-retailers-raising-prices.html (last accessed May 19, 2026)

[18] Graco Inc., *Q2 2025 Earnings Press Release,* https://www.sec.gov/Archives/edgar/data/42888/000004288825000025/ggg7232025exhibit991q2.htm. (last accessed May 19, 2026)

42. Indeed, Defendants initiated three rounds of targeted tariff-related price actions, offsetting additional cost reductions and tariff impacts.[19]

43. When the tariffs were rolled back from 30% to 20%, Defendants adjusted their pricing back to account for the tariff rollback.[20]

44. Defendants paid at least $174 million of incremental tariff costs in 2025.[21]

45. In January 2026, Graco rolled back some of its tariff-related pricing, resulting in an average 4% decrease in cost. Prices at Rubbermaid were also cut by up to 15% as Newell invested in domestic manufacturing to increase automation.[22]

---

[19] AInvest, *Newell Brands' Q2 2025 Earnings Call: Unraveling Contradictions in Sales Strategy, Innovation Impact, and Tariff Challenges*, https://www.ainvest.com/news/newell-brands-q2-2025-earnings-call-unraveling-contradictions-sales-strategy-innovation-impact-tariff-challenges-2508/ (last accessed May 19, 2026)

[20] Investing, *Earnings call transcript: Newell Brands Q4 2025 financial performance and stock reaction* https://www.investing.com/news/transcripts/earnings-call-transcript-newell-brands-q4-2025-financial-performance-and-stock-reaction-93CH-4491092. (last accessed May 19, 2026)

[21] Newell Brands, *Newell Brands Announces Fourth Quarter and Full Year 2025 Results,* https://ir.newellbrands.com/news-releases/news-release-details/newell-brands-announces-fourth-quarter-and-full-year-2025. (last accessed May 19, 2026)

[22] Salem Radio Network News, *Newell Brands cuts prices at Rubbermaid, Pack 'n Play as consumers turn frugal,* https://srnnews.com/newell-brands-to-cut-prices-at-rubbermaid-graco-as-consumers-turn-frugal. (last accessed May 19, 2026)

46. On February 20, 2026, Newell CEO Chris Peterson noted it was too early to determine the full implications, including whether tariffs could be reimposed under other authority or whether refunds would be available to the company.

47. As a result, consumers who purchased goods from Defendants during the tariff period paid elevated prices reflecting the tariff-related cost increases incorporated into Defendants' retail pricing.

48. Defendants' public statements and actions thus confirmed two critical points: first, that tariffs were increasing Defendants' costs on imported goods; and second, that Defendants were making pricing decisions in direct response to those tariff-driven cost increases.

49. These public admissions are consistent with Defendants' broader financial disclosures during the Class Period. Defendants reported strong financials while simultaneously acknowledging tariff pressures and raising prices due to tariffs. Defendants did not simply absorb the full cost of the unlawful tariffs; rather, Defendants passed on at least part of those costs to consumers through higher retail prices.

50. Defendants' own public statements and actions therefore establish a coherent timeline: Defendants acknowledged tariff-driven cost increases and Defendants selectively increased prices on affected goods during the tariff period.

51. Plaintiff and Class members paid tariff-inflated prices to Defendants during the Class Period. Defendants cannot retain both the consumer pass-through and any government refund of the same unlawful tariff charges.

**E. Tariffs Invalided by SCOTUS**

52. As described above, in February 2026, the Supreme Court held that the President's tariff regime exceeded the statutory authority granted by IEEPA and invalidated the challenged tariff orders.[23] Following the SCOTUS decision, importers that had paid IEEPA tariffs—including Defendants—became eligible to pursue refunds of those duties.

53. On March 4, 2026, the Court of International Trade, in *Atmus Filtration, Inc. v. United States*, ordered U.S. CBP to stop liquidating IEEPA duties and to reliquidate previously liquidated IEEPA duties where possible, and indicated that the relief extended to "all importers of record" that paid IEEPA duties, including importers that had not filed their own refund suits.[24]

54. The potential refund pool resulting from the invalidation of the IEEPA tariffs is enormous. Public reporting concerning the refund proceedings states that U.S. CBP estimated an "unprecedented volume of refunds," potentially involving

[23] *See Learning Res., Inc. v. Trump*, 607 U.S. ___ (2026).
[24] *See Atmus Filtration, Inc. v. United States*, No. 26-01259, (Ct. Int'l Trade Mar. 4, 2026), ECF No. 21.

53,173,939 refunds across 330,566 importers if each entry subject to IEEPA duties is entitled to a refund.[25]

55. Defendants are among the country's largest importers of consumer goods and therefore stand to recover substantial sums if tariff refunds are paid.

56. Given Defendants' scale as a major importer, Defendants can expect to recover significant tariff refunds corresponding to duties they paid during the Class Period. Those expected refunds are especially significant here because Defendants previously passed tariff-related cost increases through to consumers in the form of higher retail prices, meaning Defendants now seek to recover from the government duties whose economic burden was borne, in whole or in part, by the Plaintiff and Class members.

57. In practical terms, Defendants stand to receive a windfall: they have already recouped tariff costs from consumers through higher prices, and they now stand in line to recover those same unlawful tariff payments from the federal government.

---

[25] *See* Thompson Hine LLP, *CIT Suspends Earlier Order Directing IEEPA Tariff Refunds* (Mar. 6, 2026), https://www.thompsonhinesmartrade.com/2026/03/cit-suspends-earlier-order-directing-ieepa-tariff-refunds/.) (last accessed May 19, 2026)

### F. Plaintiff Daphne Jones's Experience

58. Plaintiff Daphne Jones purchased a Graco car seat during the tariff Class period, on December 5, 2025, as illustrated by the below invoice:


**Sent:** Friday, December 5, 2025 at 08:33:19 PM EST
**Subject:** Ordered: "Sauder Palladia Corner TV..." and 1 more item

Your Orders Your Account Buy Again

**Thanks for your order, Corie!**

Ordered Shipped Out for delivery Delivered

**Arriving Thursday**

**Daphne - KENDALLVILLE, IN**
Order # 111-1435286-0903466

View or edit order

Sauder Palladia Corner TV Stand C...
Quantity: 1
$260.31

Grand Total: **$278.53**

**Arriving Wednesday**

**Daphne - KENDALLVILLE, IN**
Order # 111-6221376-6031447

View or edit order

Graco SlimFit 3-in-1 Convertible ...
Quantity: 1
$239.99

59. Plaintiff Jones is entitled to a refund of all the tariff price increases she was charged, plus interest, she paid ultimately to Defendants.

## CLASS ALLEGATIONS

60. A class action is the proper forum to bring Plaintiff's claims under FRCP 23. The potential Class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the Class, the claims or defenses of the representative parties are typical of the claims or

defenses of the Class, and the representative parties will fairly and adequately protect the interests of the Class.

61. This action satisfies all of the implicit and explicit requirements of FRCP, including numerosity, commonality, typicality, adequacy, predominance and superiority.

62. **Numerosity**: the Class is so numerous that joinder of all members is impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery. Given the consumer base of Defendants, the class numbers in the hundreds of thousands or millions of consumers.

63. **Commonality:** the claims made by Plaintiff meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the classwide litigation. These shared questions predominate over individual questions, and they include, without limitation:

a. whether Defendants paid tariffs imposed under the International Emergency Economic Powers Act ("IEEPA") on imported goods during the Class Period;

b. whether Defendants increased retail prices on goods sold to consumers in response to those tariffs;

c. whether Defendants passed through some or all of the tariff costs to consumers through higher prices;

d. whether Defendants sought or will seek refunds of those tariffs from the federal government;

e. whether Defendants' retention of tariff refunds corresponding to tariff costs paid by consumers constitutes unjust enrichment;

f. whether Defendants' conduct was unfair under applicable consumer protection laws; and

g. the appropriate measure of restitution, damages, or other relief resulting from Defendants' conduct.

64. **Typicality**: Plaintiff's claims are typical of those of the other Class members because Plaintiff, like every other Class member, bought products from Defendants subject to tariff related price increases.

65. The claims of the Class Representative Plaintiff are furthermore typical of other Class members because she makes the same claims as other Class members. Plaintiff has an interest in seeking compensation from Defendants.

66. **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class in that she has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class members.

67. **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical.

68. The nature of this action and the nature of laws available to Plaintiff and the Class makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged. Without the class action mechanism, Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; and the costs of individual suits could unreasonably consume the amounts that would be recovered. Likewise, proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class, and will

establish the right of each member of the Class to recover on the cause of action alleged; and Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

69. The proposed class is described as follows:

> All persons in the United States who purchased goods from Defendants during the Class Period, on which Defendants raised prices due to tariffs imposed by the government.

70. Plaintiff reserves the right to modify or amend the definition of the proposed class and to modify, amend or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

71. Plaintiff will fairly and adequately protect the interests of the Class. The interests of the class representative are consistent with those of the other members of the Class. In addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

72. The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

73. Excluded from the Class are:

a. Defendants and any entities in which Defendants has a controlling interest;

b. Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendants;

c. The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

d. All persons or entities that properly execute and timely file a request for exclusion from the Class; and

e. Any attorneys representing the Plaintiff or the Class.

## CLAIMS FOR RELIEF

### COUNT I
### Unjust Enrichment
### (On behalf of Plaintiff and the Class)

74. Plaintiff incorporates by reference the foregoing allegations in paragraphs 1 through 73 as if fully set forth herein.

75. Plaintiff and the Class have conferred a benefit upon Defendants in the form of the money Defendants received from them in the form of price increases on goods during the period February 1, 2025, through February 24, 2026.

76. Defendants appreciate and/or have knowledge of the benefits conferred upon them by Plaintiff and the Class.

77. Under principles of equity and good conscience, Defendants should not be permitted to retain the amount of the price increases obtained from Plaintiff and the members of the Class, which Defendants have unjustly obtained as a result of their price increases on goods subject to unlawful tariffs. As it stands, Defendants have retained profits generated from their sales of products subject to tariff-related price increases and should not be permitted to retain those ill-gotten profits and a refund of the duties they paid.

78. Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendants have retained as a result of the unlawful and/or wrongful conduct alleged herein.

**COUNT II**
**Money Had and Received**
**(On behalf of Plaintiff and the Class)**

79. Plaintiff incorporates by reference the foregoing allegations in paragraphs 1 through 73 as if fully set forth herein.

80. Plaintiff alleges this claim individually and on behalf of the proposed class.

81. Defendants received money from Plaintiff and from each member of the proposed Class in the form of increased prices directly related to the tariffs imposed by the government. The Supreme Court has determined that the tariffs were unlawful.

82. The money belonged to Plaintiff and to each member of the proposed Class.

83. Defendants have not returned the money.

84. It will give offense to equity and good conscience if Defendants are permitted to retain the profits derived from the price increases related to the tariffs. Plaintiff seeks the return of the money in an amount to be proven at trial.

85. Plaintiff seeks all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, punitive damages, and injunctive relief, and other remedies available to her.

**COUNT III**
**Declaratory Relief, 28 U.S.C. § 2201**
**(On behalf of Plaintiff and the Class)**

86. Plaintiff incorporates the foregoing allegations in paragraphs 1 through 73 as if fully set forth herein.

87. Plaintiff alleges this claim individually and on behalf of the proposed Class.

88. Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

89. Plaintiff's claims present an actual controversy as to the rightful ownership of the money paid to Defendants due to the price increases directly related to the tariffs.

90. Plaintiff has suffered an injury by having been required to pay Defendants a tariff price increase because of the subject tariffs on Defendants' product. And Plaintiff will imminently suffer an injury by Defendants' unlawful retention of the tariff refund.

91. This Court can exercise its equitable power to enter a declaratory judgment that retention of the tariff surcharges paid by Plaintiff but refunded to Defendants is unlawful for any of the above reasons.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the proposed class pray for relief and judgment against Defendants, as follows:

a. For an order certifying the proposed classes, appointing Plaintiff and her counsel to represent the proposed class and notice to the proposed classes to be paid by Defendants;

b. For damages suffered by Plaintiff and members of the proposed class;

c. For restitution to Plaintiff and the proposed class of all monies wrongfully obtained by Defendants;

d. For injunctive relief requiring Defendants to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e. An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

f. For Plaintiff's reasonable attorneys' fees, as permitted by law;

g. For Plaintiff's costs incurred;

h. For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

i. For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

**JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

DATED: May 22, 2026 Respectfully submitted,

*/s/ Casondra Turner*
Casondra Turner (GA Bar No. 418426)
**MILBERG, PLLC**
260 Peachtree Street NW, Suite 2200
Atlanta, Georgia 30303
Telephone: (771) 772-3086
*cturner@milberg.com*

Jason T. Dennett*
**MILBERG, PLLC**
1700 7th Ave, Suite 2100
Seattle, WA 98101
Telephone: (516) 515-9124
*jdennett@milberg.com*

Terence R. Coates*
Jonathan T. Deters*
**MARKOVITS, STOCK**
**& DEMARCO, LLC**
119 E. Court Street, Suite 530
Cincinnati, OH 45202
Telephone: (513) 651-3700
*tcoates@msdlegal.com*
*jdeters@msdlegal.com*

*Counsel for Plaintiff and the Putative Class*

**Pro Hac Vice* applications forthcoming